# Isaac Dee Mangum v. The State.

No. 20545. Delivered November 15, 1939.
Rehearing Denied April 17, 1940.

The opinion states the case.

BEAUCHAMP, Judge, dissenting on rehearing.

*Maury Hughes* (of Hughes & Monroe) and *Joe Bailey Morris,* both of Dallas, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, Judge.

The appellant was convicted of murder with malice, as evidenced by the killing of L. M. Smith, and was assessed a penalty of twenty years therefor.

It appears that appellant, a minister, and also a carpenter by trade, had been divorced from his wife; and their children, one married girl and two young boys, were living with the wife. Mr. Smith had been coming to the divorced wife's home,

after the divorce, and had at times taken her and her children to church. On the night of the fatal difficulty Mr. Smith and the boys, the daughter and her husband, and appellant's former wife, had been to church, and upon their return to the home they found appellant in or near the driveway thereof. Appellant told his boys to bring him certain of his carpenter tools from the premises, and they proceeded to do so. In the meantime Mr. Smith had gotten out of the automobile, as had Mrs. Mangum also, at which time it appears from the testimony that appellant produced a pistol in his possession and Mr. Smith was shot twice therewith. The deceased seemed to have gotten the pistol away from appellant and gave it to one of the little boys, who laid it down in the driveway, and Mr. Smith went to and sat down on the gallery of the home, evidently in great pain, at which time appellant made an attack upon his former wife, and had her down on the ground beating her when the son-in-law struck appellant over the head with a brick, and with the help of others held appellant until the arrival of the officers. Mr. Smith's wounds were serious, and from them he eventually died, hence the murder charge.

Appellant's bill of exceptions No. 1 is voluminous, and occupies many pages of the record. The gist thereof, however, is a complaint that a prejudiced juror had gotten on the jury by reason of certain misstatements attributed to such juror on his voir dire examination, and that appellant, through no fault of his own, nor lack of diligence upon his part, had not had his case presented to a fair and impartial jury, it being claimed that this juror was prejudiced against the appellant, and had made statements to others prior to being accepted on the jury, evidencing such prejudice against appellant. We find the matter presented from both sides to the trial court by witnesses and affidavits upon the hearing of the motion for a new trial, and the facts relative to the mentioned juror and his statements were gone into fully before that court, who decided the matter, upon contradictory testimony, against the appellant's contention, and we find ourselves of the same opinion as that of the trial court. It was his judgment that the juror was fair and impartial, after going fully into the matter, and we do not feel called upon to disturb his ruling thereon.

Bill of exceptions No. 2 is concerned with a series of questions propounded to the witness Denver Seale, an investigator for the district attorney's office, who testified relative to a dying statement made to him by Mr. Smith. It appears that Mr. Seale had a conversation with the deceased relative to the

occurrence in which the deceased had received the wounds from which he later died, and that Mr. Seale then wrote his version of what the deceased said relative thereto, and brought the written instrument to the deceased, read it over to him in the presence of a witness, and the deceased signed the same. The questions asked Mr. Seale were, in substance: "Why didn't a lawyer from the district attorney's office go out to take this statement? * * * Were there any stenographers connected with the district attorney's office to whom the witness had access, * * * and why didn't the witness take a stenographer out there to take down verbatim this dying statement?" Objection was made to the answering of these questions, and same was by the trial court sustained. We think the trial court's ruling thereon was correct.

Bill of exceptions No. 3 relates to the trial court's ruling wherein he sustained an objection to the appellant being allowed to testify that "his boys had asked him to come back," evidently meaning that they had asked him to return to their home where they were living with their mother and sister. The testimony does not seem to evidence any materiality, especially in the manner in which it was offered. It is also to be noted that the jury actually heard the testimony, but upon objection being made the court sustained the objection; however same was not excluded from the jury's consideration by the court, and no request made relative to its exclusion. We see no error reflected herein.

Bill of exceptions No. 4 relates to the trial court excluding from the consideration of the jury certain reasons why the appellant did not go back to the home of his former wife for the last few days preceding the night of the shooting. The witness had been permitted to give the substance of a conversation claimed to have been had with the deceased a short time prior to the fatal difficulty in which he contended that the deceased had told appellant not to come over to his former wife's home; that he had also testified that he had not gone back over there prior to the night of the killing, and then when asked why the witness did not go over to such home the State objected to an answer thereto because the answer would be but a conclusion and an opinion of the witness and self-serving. We are not impressed with the materiality of this matter. We think the trial court was correct in sustaining the objection.

Bill of exceptions No. 5 is based upon the fact that while appellant was on the witness stand, upon cross-examination, he was asked if he did not have a conversation with his former

wife, after she had started going with the deceased, in which he stated to her that he, appellant, was glad she was going with Mr. Smith, and that he was a good christian character. This statement the appellant denied having made. Thereafterwards the State placed Mrs. Ethel Mangum on the stand, and, over appellant's objection, she was allowed to testify that she did have such a conversation with appellant, and that he did make such a statement relative to the character of Mr. Smith, and to their association together. We are at a loss to see where there could have been any injury to the appellant by reason of this complained of error. If it was the State's theory that this killing had occurred on account of jealousy upon the part of the appellant toward the deceased because the deceased was keeping company with Mrs. Mangum, then such testimony would have some tendency to refute this theory of jealousy upon appellant's part, and the proof of the statement purportedly made to Mrs. Mangum would not only not injure appellant but would have been helpful to him; it would have seemed to have evidenced a lack of jealousy. If offered by appellant, such a statement might have been deemed self-serving; when offered by the State, we do not think its tendency could have been to injure him. We are also not impressed with the fact that such a statement is a collateral matter. It occurs to us that any statement relative to the deceased, made by the appellant, would bear directly upon the issue herein.

Bill of exceptions No. 6 complains of certain arguments before the jury in which the State's attorney referred to the appellant as a "guilty murderer under the evidence in this case." This bill also contains a further exception to other remarks of the same State's attorney which were objected to, and which objection was sustained and the jury was instructed to disregard the latter remarks, although exception was reserved to the making of the last remark. It is therefore necessary to treat each set of remarks separately, and this bill as presented becomes multifarious. Regardless thereof, however, we think the matter free from doubt, and we will consider the same. In the remarks just above cited, we find the State's attorney drawing his deductions from the admitted testimony, with no request from appellant's attorney for an instruction to the jury to disregard the statement complained of. Mr. Branch's Penal Code, p. 204, Sec. 362, lays down the doctrine that: "Unless the remarks of State's counsel are obviously of a nature to impair the rights of defendant or to improperly prejudice his case before the jury, such remarks, though im-

proper, will not be considered for reversal unless a charge instructing the jury to disregard them was asked and refused and an exception reserved," citing a long list of cases.

To the second series of remarks an instruction was given by the court directing the jury to disregard such remarks, although exception was reserved to the making of such remarks. Under the same Sec. 362, supra, it is said: "If improper remarks of counsel are by the court withdrawn and the jury instructed not to consider them, ordinarily the injury, if any, has been cured," citing cases.

We do not think any of these remarks were so obviously injurious and prejudicial, or of such a grave character, as to evidence any injury to appellant's defense. This bill is overruled.

Bill of exceptions No. 7 has as its basis the introduction of a statement made by the deceased, offered as a dying declaration. It appears from the court's qualification thereto that upon objection of the appellant's attorneys much of this statement was by the trial court deleted, and practically the only objection left that the court did not sustain was that a portion of such statement was a shorthand rendition of the facts. We are impressed with the same idea as was contained in appellant's objection, and are of the opinion that the portion of such statement as was allowed to go before the jury was but a shorthand rendition of the facts that surrounded the killing, and we think, after laying a proper predicate for this statement, the State was well within its rights when it introduced the statement of Mr. Smith as to what took place at the time and scene where he lost his life.

Bill of exceptions No. 8 complains because of the trial court's failure to give in charge to the jury appellant's requested charge No. 10 relative to the law of threats as applied to self-defense. From a perusal of the trial court's main charge we find that a correct charge on such threats was embodied therein in language heretofore approved by this court.

The remarks relative to bill No. 8, just above, are also applicable to bill of exceptions No. 9, which latter bill contains a request for the court to charge that an assault and battery which causes pain and bloodshed would be in law termed "adequate cause." We think this matter was properly covered by the court's main charge. To the same effect as the above is appellant's bill No. 10, and we overrule the same.

Bill of exceptions No. 11 is a complaint relative to the

State's attorney's argument before the jury in which he stated, in substance, that the pistol which had been identified as the weapon with which Mr. Smith had been shot, had a hard trigger pull. It seems that the State's attorney had such pistol in his hand while arguing before the jury relative to appellant's testimony, and was demonstrating with it when he made such statement relative to the trigger pull thereof. It is to be noted that the court sustained an objection to the statement made by the State's attorney, and no request was made by appellant's attorney to have the jury instructed to disregard such remark. We overrule this bill.

Bill of exceptions No. 12 complains of the fact that after the appellant had offered testimony relative to his good reputation for truth and veracity, the State also offered testimony relative to the appellant's reputation as a peaceable law-abiding citizen. This was done, so the court's qualification says, on account of the fact that appellant had filed at the proper time a request for a suspended sentence. Art. 778, C. C. P. provides, among other things, that: "The court shall permit testimony as to the general reputation of defendant to enable the jury to determine whether to recommend the suspension of the sentence * * *."

12 Tex. Jur., p. 749, says: "The reputation contemplated by the statute is the general reputation of the accused for being a peaceable and law-abiding citizen in the community in which he has lived," citing Skelton v. State, 106 Texas Crim. Rep. 90, 291 S. W. Rep. 238; Freddy v. State, 89 Texas Crim. Rep. 53, 229 S. W. Rep. 533; Martoni v. State, 74 Texas Crim. Rep. 90, 167 S. W. Rep. 249; Campbell v. State, 73 Texas Crim. Rep. 198, 164 S. W. Rep. 850. We see no error reflected in such bill.

We think this cause has been properly tried, and it is accordingly affirmed.

### ON MOTION FOR REHEARING.

HAWKINS, Presiding Judge.

Appellant urges in his motion for rehearing that a prejudiced juror sat in his trial, and that we erred in not sustaining complaint thereof brought forward in bill of exception number one.

Evidence upon the issue as to whether a juror was prejudiced may be presented on the hearing of the motion for new trial by affidavits, oral testimony or both; in the present instance

both were resorted to. Before reverting to the evidence heard on the motion it will be well to state the principles controlling in such cases, and we quote from pages 288 and 289 of Branch's Ann. Tex. P. C. on the subject, as follows: "When it is sought to show on the hearing of the motion for new trial that a juror before the trial had expressed an opinion of defendant's guilt or had made statements which showed a prejudice against defendant, the decision of the trial court on that issue will be sustained by the Appellate Court unless clearly wrong if the evidence bearing thereon was conflicting and was sufficient, if believed, to justify the action of the trial judge." * * *

"If there is testimony tending to show that a juror before the trial had made remarks indicating prejudice against the defendant or an opinion of defendant's guilt and that this was unknown to defendant at the time the juror qualified and was accepted, but on the other hand * * * if the juror and others deny that the remarks were made, then it is a question for the trial judge to decide as to the fairness and impartiality of the juror, and unless it clearly appears that he has abused his discretion his finding on that issue will not be disturbed." Many cases are cited supporting the text.

It was alleged in the motion for new trial that the juror Oscar Dishman "had formed and expressed an opinion as to defendant's guilt and that the said juror had discussed it many times with various people, including T. L. Ellis, R. R. (Bob) Ellis, Miss Mae Johnson, Mrs. Dishman and others." To support the said averment appellant attached to his motion the affidavits of R. R. (Bob) Ellis and T. L. (Tom) Ellis. In the affidavit of Bob Ellis he states that on Sunday afternoon, January 29th, 1939—which was the day before the case was to be tried—witness in company with his brother (Tom Ellis) and the latter's wife, went to the Dishman home to pay his aunt, Mrs. Dishman and her husband a visit; that in addition to those already mentioned there were also present James Lewis, and Miss Johnson. The affidavit then recites that Mr. Dishman mentioned having gotten a summons for jury service for the next day, and then follows the relation of a conversation in which Dishman participated, the details of which it is not necessary to set out, but which, if true, showed Dishman to be a biased juror who had prejudiced appellant's case. The affidavit of Tom Ellis, which was in all material respects the same as Bob's, was also attached to appellant's motion.

The District Attorney answered appellant's motion, traversing and denying that the juror Dishman had expressed any

opinion as to appellant's case indicating that he was an unfair juror. The State attached to its answer the affidavit of the juror in which he denied categorically every statement contained in the affidavits of the two Ellis affiants, and asserted that prior to being taken on the jury he knew nothing of the facts of appellant's case, and had expressed no opinion as to his guilt or as to his case. He stated that on Sunday, January 29, 1939, Bob Ellis was at his (Dishman's) home for about ten minutes; that Bob was drinking "pretty heavily;" that Dishman remarked that he had a special venire card calling him for jury service the next day; that Bob asked what case it was on, to which Dishman replied that he did not know but it was in Judge King's court; that Bob then said, "You are on Dee Mangum's case," and someone else present said, "No, that case is not coming up tomorrow; it has been postponed." The juror then says in his affidavit, "This (the foregoing) is a full and complete conversation that I had with Bob Ellis at any time prior to the rendition of the verdict in this case regarding the trial of Isaac D. Mangum." Immediately following is a specific denial of every statement contained in the Ellis affidavits indicating knowledge on the juror's part of appellant's case or bias or prejudice towards appellant. The juror further states in his affidavit that neither Tom Ellis nor Tom Ellis' wife was in his house on Sunday, January 29, 1939, and that neither of them came there on said occasion with Bob Ellis. Dishman further affirmed that on February 12, 1939—which was after the trial—he returned home from attending a funeral and at said time found Bob and Tom Ellis and the latter's wife at his (Dishman's) house; that Miss Mae Johnson was also there and that she and the two Ellis boys all expressed dissatisfaction with the verdict in appellant's case; that on this occasion there was a general discussion of the facts in appellant's case. Attached to the State's answer was the affidavit of Mrs. Dishman who denied therein the presence of Tom Ellis and his wife at her house on January 29, 1939, and denied the truth of the statements contained in the affidavits of Bob and Tom Ellis. Also attached to the State's answer was the affidavit of J. L. Hancock, who lived with the Dishmans. He affirmed that on January 29, 1939, only Bob Ellis was at the house and stayed only a short time; that Tom Ellis and his wife were not there on said date, but that about a week after Dishman had served on the jury the two Ellis boys and their wives came to the Dishman home at which time witness heard them discussing appellant's case. Also attached to the State's answer was the affidavit of James Lewis who lived at the Dishman home. He

affirmed that he was at the house all day on January 29, 1939, and that only Bob Ellis came to the house that day and that the only thing Dishman said was that he had received a card to serve on the jury the next day; that Tom Ellis and his wife were not present; that about a week later and after the trial Bob and Tom Ellis and the latter's wife were at Dishman's house, at which time there was some discussion of the verdict and the facts in appellant's case. We take note of the fact that notwithstanding the contradictions regarding the statements in the affidavits of Tom and Bob Ellis, that no affidavit from Mrs. Tom Ellis appears in the record, neither was she called as a witness on the hearing of the motion for new trial, although both Bob and Tom claimed that she was with them at Dishman's house on January 29th. Upon the hearing of the motion appellant called as a witness Miss Johnson. It developed that she had declined to give any written statement to either the State's or appellant's attorneys, but that when the representatives of the State sought an interview with her she telephoned Bob Ellis to be present. Miss Johnson testified substantially to the same facts contained in the affidavits of the two Ellis boys as to statements made by Dishman on January 29th, asserting that both Tom and Bob were present at the time. She also testified to various conversations between Mrs. and Mr. Dishman, and between the witness and Mr. Dishman in which Dishman is claimed by her to have made statements which, if true, would show him to have been an unfair juror. The State then introduced another affidavit of Mr. Dishman which was apparently secured after Miss Johnson had given her evidence, in which affidavit Dishman specifically and categorically denied every statement claimed by Miss Johnson to have been made by him which would have in any way impugned his fairness as a juror.

Appellant makes much of the fact that the juror Dishman was not called in person to testify on the hearing of the motion. The trial court certifies that he considered all the affidavits appearing in the record, and in his qualification declines to certify as true a recital in the bill to the effect that Dishman was available as a witness, because, the court says, there was no evidence before him to that effect, and that to so certify it would be necessary for the court to assume that it was true, when it had not been made known to him in a legal way. We are cited to Wilson v. State, 128 Tex. Cr. R. 175, 79 S. W. (2d) 852 as having some bearing on the fact that Mr. Dishman did not testify in person on the hearing of the motion. The case

is not deemed to be in point. There the party who might have thrown some light on the controversy did not testify either personally or by affidavit.

The trial court and this court should always be vigilant to secure fairness and impartiality on the part of jurors, but the record before us presents a typical case where this court should move with extreme caution before holding that the trial court abused his discretion in declining to find that the juror was unfair and biased. A case could scarcely be presented where the issues were more clearly presented than in the one now before us. Certainly the trial judge was in a better position to determine that issue of fact than is this court, and we discover nothing in the record which challenges the correct exercise of the trial court's judicial discretion. Certainly the evidence upon the question was conflicting, and the evidence on the State's part was sufficient to support the trial court's ruling. He evidently accepted the State's evidence as true on the controverted issue. Making application of the controlling principles stated in the beginning of this opinion we find no just reason for disturbing the trial court's judgment.

Appellant's motion for rehearing is overruled.

BEAUCHAMP, Judge (dissenting).

I cannot agree with my associates that this case should be affirmed and am constrained to express my reasons therefor.

We are here dealing with one of the fundamentals,—the right of trial by twelve jurors, impartial, worthy and qualified. Our system provides, as near as it is humanly possible, for the selection of jurors satisfactory both to the State and to the defense. To inspire the greatest confidence in our citizenship in the fairness of our government requires a record devoid of any reasonable doubt. No greater contribution can be made than that which fosters such confidence and an assurance to all citizens that they and their descendants shall be thus treated if and when called to the bar of justice to answer any charge which may be made against them. Because of the precedent herein set and that justice may be done in this particular case, I have given to the motion before us my most earnest consideration in the light of the authorities which have been presented and which are available to us.

We must view the citizen at the bar selecting his jurors. This is done in the light of the information presented in the court room. The juror in question, O. L. Dishman, was accepted

upon his voir dire examination without any intimation, so far as the record shows, that he ever knew or heard of or had any opinion regarding the case, and with full confidence that he would sit with eleven others who would have open minds to receive the evidence from the witness box confronting the man accused and would consider it in the light of the law given them in charge by the court, and that they would retire together as twelve men to review this evidence in an effort to discover the truth in all matters at issue. No citizen of our country is called upon to render a higher service than that which he may render as a juror passing upon the property, liberty or life of the citizens of his own country. The reputation of a man for fairness as a juror is undoubtedly a cherished asset to any one privileged to perform that service.

Viewed from the standpoint of the appellant, would he have accepted this juror had all the controversy been placed before him, whether true or untrue? Would the court himself have sustained a challenge to such a juror in order that no question might arise as to the fairness of a trial with him as a member of the jury if each witness had testified before the juror was selected? Had all of the defendant's challenges been exhausted, would the court have imposed this juror on appellant?

According to the affidavits filed in the case, O. L. Dishman, a juror, had received a summons to a special venire on Monday. Within a day or two of that time, the fact was discussed in the presence of a young lady boarding in the Dishman home and in the presence of two nephews of Mrs. Dishman, who claimed to have been visitors there. Appellant's guilt and his punishment were discussed pro and con. It was said that the juror had a stubborn view toward the appellant and at least some opinion as to the severity of the punishment which should be given him. The State controverted most of the facts set out in the appellant's affidavit by affidavits of others, including that of the juror himself and of his wife, Mrs. Jennie Dishman. Miss Mae Johnson, the lady witness, declined to give her affidavit but came into court upon the motion for new trial and testified that on the morning after the homicide newspapers were read in the Dishman home and a discussion of the parties followed; .that Mrs. Dishman knew the appellant and remarked that the picture did not look like Dee Mangum; that they called him by his given name frequently. It developed that Mrs. Dishman had been acquainted with and had kept com-

pany with the appellant before she was married. This is not denied and it is not shown that appellant knew Dishman was her husband. At this time juror Dishman made some derogtory remarks about the matter, including the assertion that Mangum had been going with his secretary and that had brought about the divorce by his wife. It was also stated that Mrs. Dishman called her sister-in-law, who was related to the appellant, and discussed the matter with her. It further developed that Mrs. Dishman was a constant visitor in the court room during the trial; that her nephews, Bob and Tom Ellis, were frequently there; that Miss Johnson had attended some. Many of the important facts thus testified to by Miss Johnson were not controverted by the affidavit of Mrs. Dishman or by that of her husband, whose conduct as a juror was being attacked.

It is important to note that while Miss Johnson testified personally on the motion for new trial, she had previously been visited by the prosecution, and it is presumed that they knew something of the testimony which she would give. During the recess in the hearing on the motion for a new trial and at the noon hour, a supplemental affidavit from Dishman was secured denying some of the facts to which Miss Johnson had testified in the forenoon. A summary of the evidence discloses without dispute that Mangum had been discussed in the Dishman home. Mrs. Dishman admits that in her affidavit. There is no denial that he was a distant relative by marriage and also related to her nephews, Tom and Bob Ellis. There is no evidence in the record that Dishman's identity as the husband of a kinsman was known to the appellant at the time Dishman was selected as a juror.

The failure of Dishman to come into the court room and personally testify on the motion for new trial after his conduct as a juror had been so viciously attacked cannot be passed without notice, nor can the importance of his failure to do so be overlooked. It is quite true that there is no evidence of any misconduct of the jury nor of Dishman as a juror, but our Constitution, Section 10, Article 1, (Bill of Rights) provides for a trial "by an impartial jury." It is also prescribed that a jury in such cases as that before us shall consist of twelve men. Section 13, Article 5 of the Constitution. Even though Dishman had said nothing to his fellow jurors about his opinion in the case and so restrained himself as to vote as they voted in a perfectly mechanical way, which is certainly the most harmless position he could have taken, still the law had not been complied with. Cases should be tried according to law.

Debate on the subject of majority verdicts, plurality verdicts, and the number of jurors is a continuous one. Whether twelve jurors concurring is wise or not does not enter into the consideration of this case, but the theory of it is interesting. In 1682, Lord Summers wrote on the subject and his conclusion is corroborated by Lord Coke, wherein he recognized the significant fact that the purpose of the jury is to ascertain the truth. They referred to the recorded fact that the *twelve* major prophets of the Bible foretold the truth; that the *twelve* Apostles preached the truth; that representatives of the *twelve* tribes of Israel went to Canaan to investigate and discover the truth; and that the Holy City, New Jerusalem, was founded upon *twelve* stones of truth. If it were given to us to legislate, we could find no higher reasoning satisfying our minds than that which was acceptable to Lord Summers and to Lord Coke.

This court had before it a question in the case of Wilson v. State, 79 S. W. (2d) 852, wherein a bill of exception complained of the qualifications of a juror under facts much like those presented in this appeal. The juror drove a school bus and had discussed the nature of the homicide involved, as well as the parties, in the presence of the school children and the teacher riding in the bus. The county attorney learned that a motion for new trial was being prepared and anticipated the testimony of the teacher. Upon being informed of this fact the juror left the office of the county attorney and went to see the teacher. She declined to become involved in the matter. The only denial which the State had of the evidence given by the school children as to the conversation was by the juror himself. Because of the fact that the State did not bring the school teacher as a witness to testify in person, this court proceeded on the assumption that the juror could have secured her testimony to exonerate him, and looked upon the circumstances with disfavor, reversing the case. The action of the court in doing so is, in our opinion, a very wise one, but the facts of this case are much stronger. It is shown without contradiction that the appellant and the offense with which he was charged had been discussed in the Dishman home in the presence of and by the juror, at least to some extent, and these facts were not known to the appellant at the time Dishman was accepted on the jury. We cannot presume that the trial court found contrary to these undisputed facts. The least that can be said is that we have grave doubt as to the qualifications of the juror and respect the right of the defendant on trial to have true answers to his questions and to know what is in the mind of each and every venireman presented for service in his case.

In the face of these facts and viewing the opinion in the Wilson case, supra, with approval, I am driven to respectfully dissent from the majority opinion overruling the motion for rehearing, and believe that the importance of the question is such as to justify my action in filing this opinion.